MARK WRAY, #4425
LAW OFFICES OF MARK WRAY
608 Lander Street
Reno, Nevada 89509
(775) 348-8877
(775) 348-8351 – Fax

BERNSTEIN LIEBHARD LLP
U. Seth Ottensoser
Joseph R. Seidman, Jr.
10 E. 40th St.
New York, NY 10016
(212) 779-1414
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | | |
|---|---|---|
| WENDELL AND SHIRLEY COMBS, On Behalf of Themselves and All Others Similarly Situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. |
| vs. | ) ) | |
| LAS VEGAS SANDS CORP., SHELDON G. ADELSON and WILLIAM P. WEIDNER, | ) ) ) ) | |
| Defendants. | ) ) | |

## CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS AND DEMAND FOR JURY TRIAL

Plaintiffs allege the following based upon the investigation of their counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings made by Las Vegas Sands Corp. ("Las Vegas Sands" or the "Company"), press releases and other public statements issued by the Company, and media reports about the Company, and believe

–1–

that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This federal securities class action is brought on behalf of purchasers of the common stock of Las Vegas Sands between June 13, 2007 and November 11, 2008, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC [l7 C.F.R.  §240.10b5].

3.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act [15 U.S.C. §78aa.  Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b), as many of the acts and practices complained of herein occurred in substantial part in this District.

4.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

5.     Plaintiffs Wendell and Shirley Combs, as set forth in the accompanying certifications, incorporated by reference herein, purchased the common stock of Las Vegas Sands during the Class Period and were damaged thereby.

6.     Defendant Las Vegas Sands is a Nevada corporation whose principal executive offices are located at 3355 Las Vegas Boulevard South, Las Vegas, Nevada 89109.  Las Vegas Sands and its subsidiaries own and operate resort and gaming properties in Las Vegas, Macao and Singapore.  Before the start of the Class Period, these properties included The Venetian Resort Hotel Casino and The Sands Expo and Convention Center in Las Vegas, and The Sands Macao Casino (the "Sands Macao").  At that time the Company was in the process of developing

additional properties in Las Vegas and Macao, including The Palazzo Resort Hotel Casino in Las Vegas and the Venetian Macao Resort Hotel Casino (the "Venetian Macao") and other casino resort properties on the Cotai Strip in Macao. Las Vegas Sands' common stock is publicly traded on the New York Stock Exchange (the "NYSE") under the symbol LVS.

7.    (a)    Defendant Sheldon G. Adelson is and has been a Las Vegas Sands director since 2004. In addition, he has served as Chairman of the Company's Board of Directors (the "Board"), Chief Executive Officer ("CEO"), and Treasurer since 2004. Defendant Adelson has also served as Chairman, CEO and a director of the Company's wholly-owned subsidiary Las Vegas Sands, LLC (or its predecessors, Las Vegas Sands, Inc.) since 1988 when it was formed to own and operate the former Sands Hotel and Casino.

(b)    Defendant William P. Weidner ("Weidner") served as a member of the Board, as well as the Company's President and Chief Operating Officer ("COO"), from August 2004 to March 2009. He also served as President and COO of Las Vegas Sands, LLC (or its predecessor, Las Vegas Sands, Inc.) from December 1995 to March 2009, and as a director of Las Vegas Sands, LLC since August 2004. Although Defendant Weidner was complicit in, and responsible for, the misconduct alleged herein, he purportedly resigned his positions at the Company as a result of "outstanding differences" with Defendant Adelson.

(c)    Defendants Adelson and Weidner, are collectively referred to herein as the "Individual Defendants," and, together with Las Vegas Sands, as the "Defendants."

8.    Because of their positions with the Company, the Individual Defendants had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith.

9.      It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above.  Each of the above officers of Las Vegas Sands, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein.  These Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

10.     As officers and controlling persons of a publicly held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the NYSE, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded common stock would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

11.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public, shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with Las Vegas

–4–

Sands, each of the Individual Defendants had access to the adverse undisclosed information about Las Vegas Sands' business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Las Vegas Sands and its business, which were issued or adopted by the Company, materially false and misleading.

12.     The Individual Defendants, because off their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

13.     Each of the Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Las Vegas Sands common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme deceived the investing public regarding Las Vegas Sands' business, operations, management and the intrinsic value of its common stock, and caused Plaintiffs and other shareholders to purchase Las Vegas Sands common stock at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

14.     Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of all those who purchased the common stock of Las Vegas Sands during the Class Period and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families said their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

15.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Las Vegas Sands common shares were actively

traded on the NYSE.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Las Vegas Sands or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

16.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

17.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

18.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are: whether the federal securities laws were violated by Defendants' acts as alleged herein; whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Las Vegas Sands; and to what extent the members of the Class have sustained damages and the proper measure of damages.

19.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

20.     The Class Period begins on June 13, 2007.  On that date, Las Vegas Sands issued the following press release:

Las Vegas Sands Corp. Announces Opening Date for The Venetian Macao

-6-

LAS VEGAS, June 13 /PRNewswire-FirstCall/ -- Las Vegas Sands Corp. (NYSE: LVS) today announced that The Venetian Macao Resort Hotel, Asia's first fully integrated resort and the anchor property of the company's Cotai Strip™ development, will open on August 28, 2007.

**"This is truly a defining moment for Las Vegas Sands Corp. as our work to open Macao's first multi-use integrated resort comes to fruition and our vision of creating 'Asia's Las Vegas'™ comes one step closer to reality,"** said Sheldon G. Adelson, chairman and chief executive officer of Las Vegas Sands Corp. "As this one-of-a-kind destination resort opens, and our development of the Cotai Strip continues, Macao will begin its transformation into the type of business and tourist destination only dreamt of in the past and in doing so fulfilling the desire of the government to turn Macao into a premier leisure, entertainment, and meeting and convention destination."

"With the opening of The Venetian Macao, we are now uniquely positioned as the first destination resort in Macao to offer all the integrated amenities necessary to attract a multi-night visitor," said William P. Weidner, president and chief operating officer of Las Vegas Sands. "By appealing to a wide-array of travelers with our complete set of dining, shopping, leisure and entertainment offerings, we are repositioning Macao as a premier destination for shoppers, diners and entertainment-seekers, as well as the ideal location for businesses to hold their group meetings, conventions, or exhibitions." (Emphasis added).

21.     On August 1, 2007, Las Vegas Sands issued a press release announcing its financial results for its second fiscal quarter ended June 30, 2007.  At that time, the Company reported that net revenue had increased 18.6% to a record $612.9 million; compared to $517.0 million for the same quarter in the previous year.  Moreover, with respect to its operations in Macao, the Company reported that "second quarter casino revenues increased 21.6% to an all-time quarterly record $373.5 million versus $307.1 million in the 2006 period."

22.     Echoing the statements made in the June 13, 2007 release, Defendant Weidner, Las Vegas Sands' President and COO, emphasized the enormous significance the Company placed on establishing an enduring presence in Macao, stating, in pertinent part, as follows:

*We are now approaching a signal moment in the history of both our company and Macao.  After over five years of planning and preparation, we are now less than four weeks away from the grand opening of The Venetian Macao, and the beginning of a new era in the long and vibrant history of Macao.  With the opening of The Venetian Macao, the anchor of the Cotai Strip(TM) and Macao's*

first true integrated destination resort, with the complete set of assets and service offerings needed to generate multi-night visitation from both the region and around the world, Macao will begin in earnest to realize her true potential as a world-class business and leisure destination.

*We have continued to execute our development plans for the Cotai Strip in all areas*. We recently commenced our international marketing programs, which are designed to transform Macao into a multi-night stay international destination. We have advanced the leasing of our retail space on the Cotai Strip . . . . Our convention, tour and travel, and corporate meetings businesses are each ready to begin operations concurrently with the grand opening of The Venetian Macao. In addition, *our construction, design and development work on each of our other six sites on the Cotai Strip continued to progress,* and we continued to advance our master-plan to develop a complementary trade-fair, convention, and leisure destination on Hengqin Island, in Zhuhai of the People's Republic of China and adjacent to the Cotai Strip. *Finally, we completed a $5.0 billion credit facility which simplified our administrative reporting requirements and significantly increased our flexibility to move quickly to take advantage of emerging development opportunities worldwide.* (Emphasis added).

23.     The following day, the Company's stock price increased $6.63 per share, or 7.74%, to close at $92.31 per share, on heavy trading volume. The stock price climbed a total of $15.84 per share, or 16.1%, to close at $108.15 per share, over the next five trading days, also on heavy trading volume.

24.     On September 5, 2007, Las Vegas Sands issued a press release entitled "The Venetian Macao Establishes Itself as the Region's Top Must-See Destination," in which it continued to emphasize its prospects in Macau and represented to the market that business would prosper there. For example, Defendant Adelson stated, in pertinent part, that "[t]he enormous response to the opening of The Venetian Macao is very gratifying to us and it unequivocally validates our vision and the rationale behind the development of our multi-property Cotai Strip…." Moreover, the Company claimed that "[s]ince opening to the public the Venetian Macao-Resort-Hotel has continued to attract an unprecedented amount of visitors…. Transportation to and from the property has run smoothly making it easy for guests from across the region to come see Asia's first truly integrated resort."

25.     Thereafter, the Company's stock price steadily continued to climb on heavy trading volume. In fact, the stock price rose from $102.98 per share on September 6, 2007 to $144.56 per share on October 2, 2007.

26.     On November 1, 2007, Las Vegas Sands issued a press release announcing its financial results for its third fiscal quarter ended September 30, 2007.  At that time, the Company reported that net revenue for the quarter had increased 19.5% to a record $661.0 million, compared to $553.2 million in the third quarter of the previous year, along with a decrease in operating income as a result of pre-opening expenses associated with "preparations for the opening of The Venetian Macao" and other properties slated to open in Macau, Singapore and the U.S.  According to Las Vegas Sands, its adjusted net income and Generally Accepted Accounting Principles ("GAAP") net income, respectively, decreased $75.7 million and $145.8 million as compared to the third quarter of the previous year, "principally driven by the increases in pre-opening expenses, operating costs, depreciation and amortization expense, net interest expense, and the lower table games win percentage."

27.     Focusing on the Company's Macau operations, Defendant Weidner claimed that "[w]e remain confident, and The Venetian Macao's operating results confirm, that the execution of our strategy will deliver tremendous economic benefits to Macao and the entire region, as well as industry leading returns to our shareholders."   According to Defendant Weidner, the Macau operations positioned the Company to continue its upward trajectory:

> Looking ahead, *we remain extremely confident* that the world class product offerings of The Venetian Macao will allow us, as the market continues to evolve and mature, to convert our strong visitation, hotel occupancy and retail sales figures into market and industry leading gaining and non-gaming *revenue growth* and, ultimately, *superior financial performance.*
>
> *             *             *
>
> *We expect the maturation of all the property's elements to continue over the coming months,* and we expect to increasingly drive revenue and margin from the property as the maturation process for all our businesses continues in the months and years ahead.  (Emphasis added).

28.     Although the Company's stock price suffered a string of consecutive declines, the stock price was nevertheless buoyed by Defendants' statements concerning the Macau

-9-

operations.  For example, several trading days after Las Vegas Sands announced the launch of a high-speed ferry service between Hong Kong and Macau on November 30, 2007, the stock price began to rebound.  In the press release announcing the launch, Defendant Weidner said "the additional arrival point in Macao will help to alleviate a portion of the current traffic congestion on the Macao peninsula and enable increasing levels of visitation to both Macao and the wider region for years to come."

29.    On December 11, 2007, however, Las Vegas Sands was forced to report that the newly launched ferry service had been suspended due to legal proceedings concerning the Macau government's decision to grant a concession for the service's operation.  Although the Company disclosed on January 17, 2008 that the Macau court had lifted the suspension, the Company's stock price was adversely impacted by a steady decline, except on a handful of trading days, until after the announcement had been made.  For example, while the stock price closed down on January 17, 2008 at $74.46 per share, it closed far higher-at $85.80 per share – on January 23, 2008, several days later.

30.    In the interim, Las Vegas Sands announced its entry into a credit agreement for financing of up to SGD $5,442,604,530 for the development of the Marina Bay Sands in Singapore.  As Defendant Weidner stated in a January 4, 2008 press release, "[t]he completion of this Singapore Dollar-denominated facility, which was considered the largest private Singapore Dollar-denominated financing in Singapore's history, was accomplished on very favorable terms in a challenging global credit environment."  He added that "[t]he vote of confidence we have received from the international financial community, including leading Singapore-based financial institutions, is a testament [] to our track record of successful Integrated Resort development worldwide. . . . " On January 15, 2008, Las Vegas Sands announced that it had completed initial funding of SGD $2 billion under the credit facility, with Defendant Adelson describing it as "the largest private Singapore Dollar-denominated financing ever completed ...."

31.    On February 4, 2008, Las Vegas Sands announced its financial results for its fourth fiscal quarter ended December 31, 2007.  Specifically, the Company reported that "[n]et revenue for the fourth quarter of 2007 increased 64.8% to a record $1.05 billion, compared to

$636.3 million in the fourth quarter of 2006." The Company also stated that a "decrease in operating income of $32.8 million was driven principally by increases in operating costs" associated with the execution of its "global growth plans," including pre-opening expenses related to The Palazzo "and other properties to be opened in the future in Macao, Singapore, and the United States."

32.     In the press release, Defendant Weidner stated, in pertinent part, as follows: *"We remain pleased with both our current performance and our long-term market positioning at the Sands Macao.* In the face of high-quality competitive product, including The Venetian Macao on the Cotai Strip, the Sands is generating strong cash flow and market-leading cash on cash returns." He also noted that "[l]ooking ahead, our ongoing investments in Macao's transportation infrastructure will continue to drive visitation and improve the customer experience for Macao's visitors." (Emphasis added).

33.     During an investor conference call following the issuance of the press release, the Individual Defendants continued to emphasize that the environment in Macau was favorable to Las Vegas Sands and, further, that the Company was successfully executing its plans. In this regard, Defendant Weidner said, in pertinent part, as follows:

> And with *the steady consistent execution* of our vision to lead the transformation of Macao to the destination of (inaudible). *The big picture everything is working.* Any concern that the elements that make Las Vegas so successful as an international resort destination somehow wouldn't work in Macao *have been resoundingly dispelled.* (Emphasis added).

34.     Although the Company's stock price had declined on February 4, 2008, it increased 9.15% to close at $88.90 per share the very next day, on nearly double the volume.

35.     On April 30, 2008, Las Vegas Sands issued a press release announcing its financial results for its first fiscal quarter ended March 31, 2008. According to the Company, net revenue for the first quarter of 2008 increased 71.8% to $1.08 billion as compared to the same period during the year before. Operating income again decreased, however, this time by $34.4 million, purportedly as a result of increased operating costs associated with, among other things, the Company's growth plans and operations in Macao. In addition, the Company's adjusted net

-11-

income and GAAP net income respectively decreased $91 million and $102.1 million as compared to the first quarter of the previous year, which it also attributed to its growth plans.

36.    Commenting on these results, Defendant Weidner focused on Las Vegas Sands' Macau operations, stating, in pertinent part, as follows:

*In Asia, our efforts to transform Macao into Asia's premier business and leisure destination continue to move ahead.* The strong and consistent visitation to the Cotai Strip's anchor property, The Venetian Macao, and the solid early performance of the property's hotel, retail, and group meeting businesses, *reflect that we are continuing to deliver on the fundamental goal and commitment* we share with the people of Macao -- the transformation of Macao into Asia's premier business and leisure destination. The recent announcements by the government of Macao regarding gaming regulation appear to be consistent with that vision and support our conviction that the execution of our Cotai Strip development strategy will deliver significant economic benefits to Macao and the entire region, as well as industry-leading returns to our shareholders. (Emphasis added).

37.    In addition, while acknowledging that competition in Macau was on the rise, he noted that Las Vegas Sands had implemented appropriate measures to ensure that its operations in Macau would continue to thrive:

While our VIP gaming volumes were down sequentially due to the increasingly competitive environment that has developed in this market segment over the last few months, *we have taken actions that we believe will enable us to grow both our share of the market and our cash flow generated from this segment of our business in the future.* We remain confident that the world-class product offerings of The Venetian Macao, together with our continuing investments along the remainder of the Cotai Strip, will allow us to deliver industry-leading returns and superior financial performance.

                    *              *              *

While the results of the Sands Macao clearly reflect the increasingly competitive environment on the Macao peninsula, we remain pleased with both the competitive resilience and the long-term market positioning of the Sands. The introduction of high-quality competitive product, including The Venetian Macao on the Cotai Strip, has been significant in the last year, but will slow dramatically from this point forward, particularly on the Macao Peninsula. *In the face of this competition, the Sands continues to generate strong cash flow and market-leading cash-on-cash returns. While admittedly down year over year, both our VIP and mass volumes reflect healthy play, and our visitation statistics remain strong.* Looking ahead, we expect to further reduce the cost structure at the Sands Macao as we allocate our human resources more efficiently across the larger asset and

-12-

revenue base of The Venetian Macao, the Four Seasons Macao, and additional properties on the Cotai Strip. (Emphasis added).

38.    Moreover, Defendant Weidner noted that Macau's improving transportation infrastructure would continue to drive business:

> *Looking ahead, our ongoing investments in Macao's transportation infrastructure will continue to drive visitation and improve the customer experience for Macao's visitors.* We expect our CotaiJet ferry service, which is operated by our partner Cotai Chu Kong Shipping Management Services Co., Ltd., to be expanded in the months ahead. Over time, we expect to offer regional ferry service into Taipa's temporary Pac-On ferry terminal with more frequency and on a 24 hours per day, seven days per week basis. The expansion of this service, which carries passengers from Hong Kong's Shun Tak ferry terminal directly to Taipa and the adjacent Cotai Strip, should enhance the customer experience for visitors to Macao, particularly for customers who are attending multiple day conventions and exhibitions, or evening entertainment events. *Ongoing investments in Macao's transportation infrastructure*, including expanded ferry services, local and regional busing programs, and aviation services *should not only expand the number of visitors to Macao and the Cotai Strip and improve the customer experience of visitors to the region, but also provide opportunities for important new customers* with high discretionary incomes from around the region to visit the market for the first-time. *These new visitors and first-time customers will allow us to drive increases in both gaining and non-gaming revenue and operating income yield per visitor, and we expect our additional integrated resorts on the Cotai Strip to enhance and drive thus strategy in the future.* . . . . (Emphasis added).

39.    On June 26, 2008, a news article by Todd Wenning published on *fool.com* discussed the dangers of poor liquidity for, *inter alia*, Las Vegas Sands:

> It's not a good time for debt.
>
> Ever since the last bear market, corporate debt rates have been relatively favorable, so it's been easy for companies to load up on low-interest, tax-deductible debt that also reduced their cost of capital. Taking on debt, after all, is typically cheaper than issuing new equity.
>
> The times, they will be a-changing, however, as the reality of higher inflation and a weakening dollar will eventually force the Federal Reserve to raise rates.
>
> If that trend continues, companies with significant debt will face increased interest expenses, which will put increased pressure on their earnings growth. Feeling the pinch

-13-

So, what does this mean for you? We're never fond of substantial debt, but this environment will be particularly difficult for companies with poor credit ratings that require higher yields to satisfy debt investors.

Therefore, you should use caution approaching companies with non-investment-grade bond ratings, especially if they fall into the "highly speculative" range. At current rates, companies with non-investment-grade ratings such as Ameristar Casinos (Nasdaq: ASCA), Lennar (NYSE: LEN), and Las Vegas Sands (NYSE: LVS) will have to entice investors with bonds yielding around 8%-9% for new 10-year debt. Those yields may go even higher.

If a company is paying all of its earnings into debt expenses, there's not much left for the shareholders.

40.     After this news article, Las Vegas Sands common stock fell from an opening price of $52.65 per share to close at $50.19 per share.

41.     On July 2, 2008, a *Bloomberg.com* article stated:

July 2 (Bloomberg) -- Las Vegas Sands Corp., the world's largest casino company by market value, may borrow about $7 billion to expand and refinance debt for projects in Macau, according to three people familiar with the deal.

The company is in talks with lenders for the deal, which would be its biggest outstanding loan, to help fund new casinos and hotels in the former Portuguese colony, said the people, who declined to be identified because the information isn't public. It may also replace $3.3 billion of loans taken in 2006 to finance its Venetian casino resort in the city, the people said.

The loan will help Las Vegas Sands fund $12 billion in spending on a 20,000-room hotel and casino complex in Macau, the place that overtook the Las Vegas Strip in 2006 as the world's biggest gambling hub. Las Vegas Sands shares fell to the lowest in 2 1/2 years and have shed more than half their value in 2008.

"Demand for gaming in Macau is still growing fairly well, but supply is an issue," said Gabriel Chan, an analyst at Credit Suisse Group in Hong Kong. "The growth of supply is just outrageous. This, together with rising labor costs and inflation, will put further pressure on every casino operator in the next couple of years."

Macau, the only region in China where gambling is legal, has also drawn investors including Wynn Resorts Ltd. and MGM Mirage. Credit Suisse expects the supply of gaming tables in Macau to increase by 30 percent next

-14-

year, outpacing the 20 percent expansion the Swiss bank forecast for demand, Chan said.

Las Vegas Sands dropped $2.43, or 5.4 percent, to $42.44 by 4:05 p.m. in New York Stock Exchange trading, the lowest price since January 2006. The shares have plunged 59 percent this year.

"The company does not comment on rumor or speculation," Las Vegas Sands' spokesman Ron Reese said today in a telephone interview.  If Las Vegas Sands has anything to report, it will file the information with the Securities and Exchange Commission, he said.

42.     On July 30, 2008, Las Vegas Sands issued a press release announcing its financial results for its second fiscal quarter ended June 30, 2008:  "Net revenue for the second quarter of 2008 increased 81.4% to $1.11 billion, compared to $612.9 million in the second quarter of 2007."  Again, however, Las Vegas Sands reported a decrease in operating income of $13.0 million – purportedly as a result of increased operating costs associated with, among other things, the Company's growth plan and operations in Macao.

43.     Commenting on these results, Defendant Weidner stated, in pertinent part: "Our second quarter results reflect both solid operating performance in Macao and Las Vegas and the measured execution of our global growth and development strategy.  In Asia, our efforts to transform Macao into Asia's premier business and leisure destination *steadily march forward*." (Emphasis added).

44.     The above-referenced statements in paragraphs 20-43 concerning Las Vegas Sands` business and operations were false and misleading when made because, among other things: (i) increasing competition in Macau was steadily eroding the Company's foothold in the region, which undermined Defendants' representations that everything was proceeding according to plan; (ii) the Company was facing a significant liquidity crisis as a result of its ongoing expenditure of capital in Macau and Singapore, which forced the Company to divert funds from other operations to develop its Asian properties; (iii) the Company could not, in fact, weather the economic downturn, because the credit markets were drying up and Las Vegas Sands had failed to timely access those markets; and (iv) increasing visitor restrictions in Macau, which Defendants represented would not impact the Company as significantly as its competitors (or

-15-

otherwise publicly dismissed), were expected by Defendants to have just as devastating an effect on Las Vegas Sands.

45.     On August 19, 2008, a Reuters.com article stated:

(Reuters) –

…Shares of Las Vegas Sands Corp (LVS.N) were down more than 11 percent….

[The] Portuguese news agency Lusa, quoting unnamed sources, reported on Tuesday that the Chinese government may tighten individual visas to Macau to one visit every six months from the current limit of one every two months.

"From the tone of the article and talking with our sources on the ground, we do not think the government has made a final decision yet," Morgan Stanley analyst Celeste Mellet Brown said in a research note.

She said the government has made it clear that it is determined to slow the strong gaming revenue growth seen in Macau and Morgan Stanley is forecasting year-over-year growth to drop from 50 percent in the first half of this year to around 25 percent in the second half and to 16 percent in 2009.

In July, China limited Macau visas under its individual visit scheme to once every two months. In addition, starting in September, mainland residents will no longer be able to enter Macau on a Hong Kong visa.

46.     As a result, Las Vegas Sands shares fell from an opening price of $48.38 per share to close at $45.53 per share on high volume.

47.     On August 22, 2008, Las Vegas Sands held a conference call with analysts in which Defendant Adelson strongly implied that he would ensure that the Company would not face liquidity problems.  Analysts, however, were skeptical.  Shaun Kelley, a Bank of America analyst, downgraded Las Vegas Sands to a "sell," reasoning that "the casino operator has greater funding needs than investors may recognize."  A Forbes.com article, entitled "Chips are Down for Las Vegas Sands," quoted Kelley as saying, in relevant part, that Las Vegas Sands "has 'significant funding needs' across the company over the next 12 months.  In addition to the well-known capital raising process in Macau [seeking $5.25 billion], we believe the U.S. and Singapore also face funding needs that are larger than most investors currently realize[.]"  Kelley attributed his funding concerns to a leverage covenant in the U.S. that begins in the third quarter

-16-

and a requirement for 20% equity in Singapore that had been funded from the U.S. until that time.

48.     Less than a week later, on the one-year anniversary of The Venetian Macau, Defendant Adelson informed reporters that the Company would prosper despite the weaker economic environment and insisted that its "*entire strategy avoids the possibility of an economic slowdown, a recession.*" (Emphasis added). Defendant Adelson and other Las Vegas Sands executives also reportedly "argued that possible stricter visa rules for mainland Chinese tourists, who make up the majority of Macau visitors, would affect them less than their rivals. That's because company's Macau properties are less reliant on Chinese visitors than other casinos, they contended."

49.     Despite deepening concern about the Company's economic outlook and financial stability, on September 4, 2008, Las Vegas Sands announced that it had reached an agreement with Starwood Hotels & Resorts to open The St. Regis Residences at the Venetian Palazzo, Las Vegas, a collection of 398 private luxury residences that would "introduc[e] the renowned St. Regis brand to Las Vegas, Nevada." According to the Company's press release, Defendant Adelson attempted to allay concerns that the extensive (and expensive) endeavor would not survive in the challenging economic environment: "Addressing would-be skeptics, Adelson said quality and luxury sell in any type of financial environment and, when combined with the premium location of these residences, he believes the company has a surefire winner."

50.     On September 10, 2008, the Nevada Gaming Control Board released a report in which it disclosed that Las Vegas Strip revenue had declined by approximately 14.7% in July 2008 and slot win (the amount casinos keep from their slot machines) was off by 9%. In reaction to this news, Las Vegas Sands stock fell 10.8%. Furthermore, Jake Fuller, a Thomas Weisel Partners analyst, expressed concern about the Company because of financing concerns, high stock prices, and supply-side risk.

51.     Less than a month later, on September 30, 2008, the Company announced that Defendant Adelson and his family had completed a $475 million private transaction investment in convertible senior notes due October 2013, which purportedly prevented the Company from

violating lender covenants.  According to the terms of the transaction, the debt pays an interest rate of 6.5% and converts into common stock at a price of $49.65 per share.

52.     Despite this cash infusion, the very next day, Standard & Poor's Rating Services announced that it was keeping the Company's ratings under "review for a potential downgrade." Though Defendant Adelson's $475 million investment appeared to address near-term liquidity concerns, it did little to allay Standard & Poor's concern over Las Vegas Sands' "overall liquidity position, continued weak performance on the Las Vegas Strip and a possible 'significant' slowdown in the Chinese gambling enclave of Macau."  Standard & Poor's also noted that the Company was still borrowing significant sums of money for development purposes.

53.     On September 22, 2008, *Forbes.com* published the following:

Gaming stocks dive on concern that the tight credit markets are making it hard to fund ongoing expansion projects.

Investors aren't as willing to bet on casinos when capital and liquidity are as scarce as they are right now.

Casino stocks dropped dramatically Monday on concern that with the credit markets tight, the companies won't be able to fund ambitious ongoing expansion project…. Las Vegas Sands…plummeted 17.7%, or $7.75, to close at $36.05.

Many of the big gaming companies have international, as well as domestic, projects in the works that need major funding if they are ever going to make it to the ribbon-cutting ceremony.

….Las Vegas Sands was downgraded to B+ by Standard & Poor's rating service on Friday due to the current capital market conditions, a softening of the Macau market, and a slowdown on the Vegas strip. The company is still on Credit Watch negative, S&P's list of company's that could face further downgrades.

54.     After the market closed on September 30, 2008, *PR Newswire* published the following article:

LAS VEGAS SANDS : Corp. Announces Investment from Sheldon G. Adelson Family
09/30/2008 | 11:44 pm

LAS VEGAS, Sept. 30 /PRNewswire-FirstCall/ -- Las Vegas Sands Corp. (NYSE: LVS) today announced that Sheldon G. Adelson, its chairman, chief executive officer and principal stockholder, and his family, have completed an investment in the company of $475 million in convertible senior notes in a private transaction.

"My family and I are pleased to make an additional investment in Las Vegas Sands Corp. as the company advances its development plans both domestically and around the globe," said Mr. Adelson. "While the credit markets are experiencing turbulence, our strategy remains alive and well and our business continues to march forward. Little of our fundamental business strategy has changed and this investment will strengthen our capitalization and liquidity position as we continue to execute our plans."

55.     As a result, on October 1, 2008, Las Vegas Sands stock price fell from an opening price of $36.47 per share to close at $31.32 per share.

56.     On October 2, 2008, Las Vegas Sands' stock was downgraded due to concerns about the slowing growth in Las Vegas and new travel restrictions in Macau.  On this news, Las Vegas Sands stock fell an additional 15.4%.

57.     On October 3, 2008, Fuller again expressed concern and cut the Company's price target, commenting that Defendant Adelson's cash infusion did not cancel ongoing concerns regarding funding, the Las Vegas market and the Macau market.  Fuller said that although Defendant Adelson's investment afforded the Company "some time," the Company still needed to raise money for its Cotai Strip development plans.

58.     As a result, Las Vegas Sands stock fell from an opening price of $27.44 per share to close at $23.11 per share.

59.     On October 20, 2008, *Marketwatch.com* reported that Las Vegas Sands was still attempting to secure $2 billion in financing for expansion in Macau even though, according to the *South China Morning Post*, the Company had completely scrapped plans to raise money for the Macau expansion.  Nevertheless, Defendant Adelson contested reports that Las Vegas Sands had abandoned efforts to expand in Macau.  Indeed, on October 22, 2008, Defendant Adelson announced he was seeking to raise $2 billion in debt financing from Asian banks to complete work on expansion projects in Macau that the Company had already planned.

60.     Only two days later, Defendant Adelson announced plans to participate in a capital raising program with an unnamed investment banking firm.  In reaction to this news, investors sent Las Vegas Sands shares down 15.1% in midday trading.  Then, on October 23 and 24, 2008, Las Vegas Sands shares fell another 29.9% and 23%, respectively.  Defendant Adelson's participation in the program raised concerns, according to Stifel Nicolaus & Co. analyst Steven Wieczynski, who believed "that the company's faltering financial position has been the biggest overhang on the stock."  In an October 24, 2008 article entitled "Adelson to partake in capital program," the Las Vegas Sun reported that Wieczynski "believes investors are selling shares because the current credit crisis has raised fears that 'Las Vegas Sands is in jeopardy of running out of cash and going bankrupt.'"

61.     On October 29, 2008, Reuters reported that the opening of the Company's Marina Sands Casino in Singapore could be delayed due to construction issues.  However, on October 30, 2008, the Company reaffirmed that it was on track to meet the previous target date for the opening.

62.     Nevertheless, as Sterne Agee analyst Nicholas Danna noted, the Company was still in need of further financing, "but at the same time [was] in danger of violating leverage ratios."  Critically, on November 6, 2008, the Company's auditor, PricewaterhouseCoopers LLP ("PwC"), expressed doubt about the Company's ability to continue as a going concern, prompting PwC to issue a going concern qualification.  In response, the trading price of Las Vegas Sands common stock plummeted nearly 33%.

63.     A November 6, 2008 Reuters article confirmed the marketplace's concern regarding the Company's financial condition.  Specifically, the article noted that "[based on current estimates, the Company] expects it will not be in compliance with its maximum leverage ratio covenant for the fourth quarter and subsequent quarters."  The article pointed out that "[n]oncompliance would result in defaults, which raises substantial doubt about the [C]ompany's ability to continue as a going concern."

64.     In an attempt to detract attention from the negative press, on November 7, 2008, Las Vegas Sands announced that Defendant Adelson had met with government officials in

Singapore to discuss financing and completion of Singapore's first casino, The Marina Sands, amid concern regarding the credit markets. The Company also sought to reassure investors by announcing the hiring of a new CFO and Senior Vice President, Kenneth J. Kay, as of December 1, 2008. Despite its attempts to deflect the negative press and alleviate investors' concerns, Las Vegas Sands was forced to announce that it was likely to violate debt covenants if it could not obtain more financing. This concern raised the very real possibility that the Company would not survive the economic crisis and revealed that its cash flow was not enough to cover the Company's fixed charges. In reaction to this news, Las Vegas Sands' share price fell 11%.

65.     Compounding shareholders' fears were additional statements that the Company issued which suggested that it would not weather the economic environment. On November 10, 2008, Las Vegas Sands announced its third quarter 2008 financial results, in which the Company disclosed that it was significantly cutting back development and reducing capital expenditures by $1.8 billion. The Company also revealed that it would delay plans to build as many as eight more hotels in Macau because of a lack of financing options. Defendant Weidner was quoted as saying that the Company was slowing its development pace in Macau as it concentrated on "current efforts on maximizing our cash flow and our returns on invested capital from our existing properties in Macau." The Company also announced that it would suspend work on the St. Regis project in Las Vegas and would instead focus on building a scaled-down version of a new casino on the site of the old Bethlehem Steel plant in Pennsylvania, as well as finishing the $5 billion Marina Sands resort in Singapore.

66.     In addition, on November 10, 2008, Las Vegas Sands disclosed that it had formed an Executive Committee whose role was "to exercise the powers of the board of directors in between scheduled board meetings, including the power to resolve disagreements among management." The Company detailed the formation of the Executive Committee in its Form 10-Q, filed with the SEC on November 10, 2008, noting that the Executive Committee's purpose was "to address governance concerns raised by the Senior Management Members, address a number of outstanding differences between our Chief Executive Officer [Defendant Adelson] and other Senior Management Members and in response to a loss of confidence by certain Senior

Management Members in the management of the Company and our governance process." The Executive Committee was "comprised of Irwin Chafetz, Michael A. Leven and Irwin A. Siegel, with Mr. Leven being the Chairman of the Executive Committee."

67.     That same day, the Company also revealed that Goldman Sachs had successfully arranged $2.14 billion in new capital, including a multimillion dollar investment from Defendant Adelson – his second personal investment in the Company in as many months.  Defendant Adelson retained a majority stake in the Company.

68.     By the end of the day on November 11, 2008, shares of Las Vegas Sands plummeted another 17% after it announced that it would suspend construction activity in Macau to help preserve cash and try to raise money for projects underway in Singapore and Pennsylvania.  The Company also announced that it would make a public offering of 182 million shares of stock, along with nearly 92 million shares of preferred stock, in an attempt to raise more than $2 billion in capital.  Defendant Adelson participated in the offering, thereby ensuring that his majority stake in the Company remained safe and secure.  Despite that the offering more than doubled the number of outstanding shares and significantly diluted the minority shareholders' interests, the Company took the unprecedented step of not seeking shareholder approval, which it acknowledged the NYSE rules would have required.  Instead, the Company attempted to justify its refusal to obtain shareholder approval on the purported basis that "any delay caused by securing shareholder approval . . . would seriously jeopardize the ability to complete the offerings as well as the financial viability of the company."

**POST-CLASS PERIOD EVENTS**

69.     The Company's high debt load and generally negative trends in Las Vegas caused Moody's Investors Service to cut the Company's credit ratings on November 12, 2008 into junk territory.  In addition, at the corporate level, Moody's Investors Service cut several other ratings, including the probability of default, from "Baa" to "B2."

70.     On the heels of the Company's worse-than-expected third quarter results, Las Vegas Sands announced that it would fire as many as 11,000 construction workers after a "cash crunch" forced it to halt construction on a number of projects, including two sites in Macau.

71.     On November 17, 2008, PwC revised its outlook concerning in doubt of Las Vegas Sands' ability to continue as a going concern when it was confirmed that the $2.14 billion in capital raised would support the Company's operations.  In an Associated Press article entitled "Las Vegas Sands Says It's Ready for Future," Defendant Weidner was asked why the Company did not raise the sorely needed capital earlier, to which he responded: "It was a matter of robust debate within the organization.  There are several of us who have very strong opinions . . . . *It was pretty much a monumental screw-up."*  (Emphasis added).

72.     Subsequently, the price of Las Vegas Sands stock, as well as its prospects, continued to decline.  On November 19, 2008, a *Bloomberg.com* article debunked the explanation given by the Individual Defendants:

> Nov. 19 (Bloomberg) -- Wynn Resorts Ltd. Chairman Steve Wynn said he's in "complete disagreement" with a Las Vegas Sands Corp. senior executive who said government decisions may have hurt the development of Macau casinos.
>
> "In any economy, growth has to be done in phases," Wynn said in an interview on Bloomberg TV today. "If someone tries to build six hotels at once and finds the market can't accommodate it, there's a problem with the planning." Gambling growth in Macau is slowing on the global recession and restrictions by China on its citizens' travel to the city. Las Vegas Sands Corp, controlled by billionaire Sheldon Adelson, said this month it halted development at its $12 billion project in Macau, leading to at least 9,000 job losses.
>
> "There have been some changes in terms of the central government's attitude toward Macau," Las Vegas Sands President William Weidner said at an investor conference on Nov. 17. "We don't think it's necessarily all that prudent to put more money in until we see how that attitude works its way out."
>
> Average monthly revenue at Macau's casinos may fall to 7 billion patacas ($877 million) next year from 8.2 billion so far this year, Edmund Ho, the city's chief executive, said Nov. 11. Macau's government will take over any casino that goes bankrupt, he added.
>
> "The worst is yet to come for the Macau sector," Karen Tang, a Hong Kong-based analyst at Deutsche Bank AG, wrote in a report today. Gambling revenue may fall 14 percent in 2009 and 6 percent in 2010, she said.
>
> Gambling Revenue

Casino revenue in Macau has more than doubled since 2004, when the government ended the 40-year monopoly of Stanley Ho, not related to the chief executive, and allowed foreign companies Las Vegas Sands, Wynn Resorts Ltd. and MGM Mirage to operate.

"There's no question the modification of the visa rules have impacted Macau's gambling revenue," said Jonathan Galaviz, a partner at Las Vegas-based consultant company Globalysis Ltd. "At the same time, there's the side benefit of allowing the growth to be fully absorbed in the next few years when the infrastructure of the city becomes more enhanced."

China restricted travel by its citizens to Macau, the only Chinese city where casinos are legal, to limit growth in high-roller gambling in the former Portuguese colony. Mainland Chinese travelers to Hong Kong can no longer visit Macau using the same visa. Since Oct. 1, residents of neighboring Guangdong province have only been allowed one visit to the city every three months.

"The community has to be given a chance to absorb such expansion in an orderly fashion," Wynn said in today's interview. "I found the government's policies evenhanded."

Las Vegas Sands on Nov. 14 said it raised $2.1 billion selling stock and warrants, to repay debt and finance development projects. Adelson and his family invested $525 million on top of the $475 million the chairman injected on Sept. 30.

The casino owner needs the cash to avoid violating the terms of some U.S. loans and triggering defaults that risked forcing it into bankruptcy. It suspended construction projects in Macau and Las Vegas to focus on finishing a $5 billion Singapore project and the casino part of its Bethlehem, Pennsylvania, site.

73.     As of November 21, 2008, Las Vegas Sands' stock price sunk to $3.23 per share after it was revealed that BMO Capital analyst Jeffrey Logsdon slashed the Company's 2009 and 2010 adjusted earnings estimates following the latest capital infusion: he dropped his 2008 adjusted profit forecast to 6 cents per share from 9 cents per share, and his 2009 estimate to 6 cents per share from 43 cents per share, and reduced his 2010 prediction to 21 cents per share from 66 cents per share.

74.     On November 24, 2008, the Company issued a press release in which it announced that Andrew R. Heyer had resigned from the Company's Board and that the

Company was now deficient in meeting the NYSE's minimum listing requirements because he had also resigned from the Board's Audit Committee.

75.     Thereafter, Las Vegas Sands announced that it was planning to also cut 216 full-time employees from its Las Vegas properties.  The Company also suspended various development activities as a result of a lack of capital.  For example, although Las Vegas Sands indicated that it would complete construction of the casino component of the Bethlehem Sands, construction on associated components – including "a 300-room hotel, an approximate 200,000-square-foot retail facility, a 50,000-square-foot multipurpose event center and a variety of additional dining options" – were "temporarily suspended."  The Company noted that development would not recommence until "capital markets and general economic conditions improve," which, at that time, was not expected to occur until the second quarter of 2009 at the earliest.

76.     The Company also confirmed that it continued to suspend construction of the St. Regis Residences and that it did not intend to recommence construction until conditions improved.  The Company further warned that "it will take approximately 18 months from when construction recommences to complete the project."

77.     On December 18, 2008, analyst Susquehanna downgraded Las Vegas Sands:

> Susquehanna Downgrades Las Vegas Sands (LVS) to Neutral
> [Y]esterday LVS closed at exactly $7.50. We are quite content with a ~50% move in less than a month, so we are moving our rating to Neutral from Positive. While recent developments point to a possible unfreezing of the capital markets and of transaction activity, we do not see any indication of better outlook for gaming fundamentals. As such, we think the recent move in gaming stocks is more a function of diminishing default/bankruptcy risk, not expectations of regained earnings momentum. For LVS, we do not see much upside beyond here.

78.     Then, on March 9, 2009, Las Vegas Sands issued a press release announcing that effective April 1, 2009, Leven would assume the positions of President and COO of Las Vegas Sands, and that Defendant Weidner was no longer with the Company.  In fact, Defendant Weidner reportedly had resigned from all of his positions with the Company and its affiliates, including as a member of the Board.

79.   On March 10, 2009, Moody's Investors Service cut Las Vegas Sands' corporate family and probability of default rating from "B2" to "B3," meaning that an investment in the Company is speculative and undesirable.

80.   Then, on March 13, 2009, the Company announced that Schwartz had been appointed to the Board to replace James Purcell, who had resigned on March 9, 2009.  According to Purcell's March 9, 2009 resignation letter, reprinted in the March 13, 2009 Form 8-K, Purcell resigned from the Board and its Audit and Compensation Committees after "conclud[ing] that continued service in those capacities ha[d] become untenable."

81.   On March 24, 2009, Brad Stone, Executive Vice President and President of Global Operations and Construction for Las Vegas Sands, also resigned.

82.   Defendants successfully implemented their scheme to artificially inflate the price of Las Vegas Sands common stock, which had the intended effect of stimulating the purchase of the Company's shares and buoying the stock price so as to fund various extraordinary transactions, described herein.  When the scheme began to falter, however, Defendant Adelson utilized his stranglehold over the Company to oust Defendant Weidner, whom he publicly blamed for the Company's failings.  For his part, Defendant Weidner engineered a lucrative exit from the Company, characterizing his departure as a resignation for good cause.

83.   The market for Las Vegas Sands common stock was open, well-developed and efficient at all relevant times.  As a result of the materially false and misleading statements and failures to disclose, Las Vegas Sands common stock traded at artificially inflated prices during the Class Period.  Plaintiffs and other members of the Class purchased or otherwise acquired Las Vegas Sands common stock relying upon the integrity of the market price of Las Vegas Sands common stock and market information relating to Las Vegas Sands, and have been damaged thereby.

84.   During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Las Vegas Sands common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were

1  materially false and misleading in that they failed to disclose material adverse information and

2  misrepresented the truth about the Company, its business and operations, as alleged herein.

3        85.    At all relevant times, the material misrepresentations and omissions particularized

4  in this Complaint directly or proximately caused or were a substantial contributing cause of the

5  damages sustained by Plaintiffs and other members of the Class.  As described herein, during the

6  Class Period, Defendants made or caused to be made a series of materially false or misleading

7  statements about Las Vegas Sands' business, prospects and operations.  These material

8  misstatements and omissions had the cause and effect of creating in the market an unrealistically

9  positive assessment of Las Vegas Sands and its business, prospects and operations, thus causing

10  the Company's common stock to be overvalued and artificially inflated at all relevant times.

11  Defendants' materially false and misleading statements during the Class Period resulted in

12  Plaintiffs and other members of the Class purchasing the Company's common stock at

13  artificially inflated prices, thus causing the damages complained of herein.

14  **ADDITIONAL SCIENTER ALLEGATIONS**

15        86.    As alleged herein, Defendants acted with scienter in that they knew that the public

16  documents and statements issued or disseminated in the name of the Company were materially

17  false and misleading; knew that such statements or documents would be issued or disseminated

18  to the investing public; and knowingly and substantially participated or acquiesced in the

19  issuance or dissemination of such statements or documents as primary violations of the federal

20  securities laws.  By virtue of their receipt of information reflecting the true facts regarding Las

21  Vegas Sands, their control over, and/or receipt and/or modification of Las Vegas Sands'

22  allegedly materially misleading misstatements and/or their associations with the Company which

23  made them privy to confidential proprietary information concerning Las Vegas Sands,

24  Defendants participated in the fraudulent scheme alleged herein.

25        87.    In fact, the Individual Defendants acknowledged that they had access to

26  undisclosed, material information concerning the business, operations and prospects of Las

27  Vegas Sands during the Class Period.  In a July 22, 2008 press release, for example, Las Vegas

28  Sands announced that it would not pursue a gaming opportunity in Kansas, purportedly "after a

thorough evaluation of the impact of proposed statutory changes in the neighboring Missouri gaming marketplace . . . ." Defendant Weidner noted that Defendants' evaluation of the Company's plans resulted in this decision, stating, in pertinent part, that "[a]s we pursue our development plans and evaluate potential opportunities around the globe, *we constantly review those plans* to determine which ones are the most beneficial for the company, its shareholders, and our employees, as well as the communities in which we intend to operate ...."

88.     In addition, during the Class Period, Defendants caused Las Vegas Sands to engage in various extraordinary financial transactions which would not have been possible in the absence of its fraudulently inflated stock price. While certain of these transactions purported to further Las Vegas Sands' business prospects, these transactions by and large benefitted Defendant Adelson and would not have been possible absent the fraud.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

89.     At all relevant times, the market for Las Vegas Sands common stock was an efficient market for the following reasons, among others:

(a)     Las Vegas Sands stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, Las Vegas Sands filed periodic public reports with the SEC and the NYSE;

(c)     Las Vegas Sands regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Las Vegas Sands was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

90.     As a result of the foregoing, the market for Las Vegas Sands' common stock promptly digested current information regarding Las Vegas Sands from all publicly available sources and reflected such information in Las Vegas Sands' stock price.  Under these circumstances, all purchasers of Las Vegas Sands' common stock during the Class Period suffered similar injury through their purchase of Las Vegas Sands common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

91.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Las Vegas Sands who knew that those statements were false when made.

## COUNT I
### Violation of §10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

92.     Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

93.     During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

94.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

95.     Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Las Vegas Sands common stock. Plaintiffs and the Class would not have purchased Las Vegas Sands common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

96.     As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Las Vegas Sands common stock during the Class Period.

## COUNT II
### Violation of §20(a) of the Exchange Act
### Against the Individual Defendants

97.     Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

98.     The Individual Defendants acted as controlling persons of Las Vegas Sands within the meaning of Section 20(a) of the Exchange Act as alleged herein. By reason of their positions as officers and/or directors of Las Vegas Sands, and their ownership of Las Vegas Sands stock, the Individual Defendants had the power and authority to cause Las Vegas Sands to engage in the wrongful conduct complained of herein.

99.     By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

-30-

B.      Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all claims and issues so triable.

DATED: July 21, 2010          **LAW OFFICES OF MARK WRAY**

By: _Mark Wray_
Mark Wray, #4425
608 Lander Street
Reno, Nevada 89509
Telephone: 775.348.8877
Fax: 775.348.8351

**BERNSTEIN LIEBHARD LLP**
U. Seth Ottensoser
Joseph R. Seidman, Jr.
10 E. 40th Street
New York, NY 10016
Telephone: 212.779.1414

Attorneys for Plaintiffs

06/22/2010 TUE 17:10  [TX/RX NO 7746] ⏸001

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

SHIRLEY COMBS _____ ("PLAINTIFF"), declares the following as to the claims asserted under the federal securities laws:

1.      Plaintiff has reviewed the complaint filed in this matter and has authorized the filing of a complaint based on similar allegations in a related or amended complaint. Plaintiff retains Bernstein Liebhard LLP and such counsel they deem appropriate to associate with to pursue such action.

2.      Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff=s counsel or in order to participate in this private action.

3.      Plaintiff is willing to serve as a lead plaintiff either individually or as part of a group. A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial. I understand that the litigation is not settled, this is not a claim form, and sharing in any recovery is not dependent upon execution of this Certification.

4.      Plaintiff's transaction(s) in the **LAS VEGAS SANDS CORP.** security that is the subject of this action during the class period are as follows:

| No. of Shares | Stock Symbol | Buy/Sell | Date | Price Per Share |
|---|---|---|---|---|
| 50 | Lvs | Buy | 11/06/2007 | 107.6 |
| 50 | Lvs | Buy | 11/07/2007 | 111.77 |
| 50 | Lvs | Buy | 11/07/2007 | 114.8 |

Please list other transactions on a separate sheet of paper, if necessary.

5.      Plaintiff has been appointed to serve as a representative party for a class in the following actions filed under the federal securities laws during the three years prior to the date of this Certification:

6.      Plaintiff is not currently seeking to serve as a representative party for a class in any actions filed under the federal securities laws.

7.      Plaintiff initially sought to serve as a representative party for a class in the following actions filed under the federal securities laws during the three years prior to the date of this Certification:

8.      The undersigned is authorized to sign this Certification on behalf of Plaintiff.

9.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff=s pro rata share of any recovery, or as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _18_ th day of June, 2010.

_____
Signature

Shirley Combs
Print Name

*Listed 3 accounts which have LVS. stock for Wendell + Shirley Combs*

21924...1

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

### Shirley Combs

| no. of shares | stock symbol | buy/sold | date | price per share |
|---|---|---|---|---|
| 150 | lvs | sold | 11/28/2007 | 112 |
| 150 | lvs | buy | 11/29/2007 | 110.98 |
| 150 | lvs | sold | 12/3/2007 | 112 |
| 50 | lvs | buy | 12/5/2007 | 110.98 |
| 50 | lvs | sold | 2/8/2008 | 87.43 |
| ~~50~~ | ~~lvs~~ | ~~buy~~ | ~~2/26/2008~~ | ~~4.84~~ |
| 50 | lvs | buy | 3/4/2008 | 84.82 |
| 75 | lvs | buy | 6/6/2008 | 69.48 |
| 50 | lvs | buy | 6/2/2008 | 64.5 |
| 50 | lvs | buy | 7/15/2008 | 34.98 |
| 40 | lvs | buy | 10/7/2008 | 26.08 |

06/22/2010 TUE 17:10   [TX/RX NO 7746] Ø005

# CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

SHIRLEY COMBS___ ("PLAINTIFF"), declares the following as to the claims asserted under the federal securities laws:

1.  Plaintiff has reviewed the complaint filed in this matter and has authorized the filing of a complaint based on similar allegations in a related or amended complaint. Plaintiff retains Bernstein Liebhard LLP and such counsel they deem appropriate to associate with to pursue such action.

2.  Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff=s counsel or in order to participate in this private action.

3.  Plaintiff is willing to serve as a lead plaintiff either individually or as part of a group. A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial. I understand that the litigation is not settled, this is not a claim form, and sharing in any recovery is not dependent upon execution of this Certification.

4.  Plaintiff's transaction(s) in the **LAS VEGAS SANDS CORP.** security that is the subject of this action during the class period are as follows:

| No. of Shares | Stock Symbol | Buy/Sell | Date | Price Per Share |
|---|---|---|---|---|
| 50 | lvs | buy | 11/02/2007 | 137.98 |
| 50 | lvs | buy | 11/05/2007 | 130.5 |
| 40 | lvs | buy | 11/14/2007 | 105.43 |

**Please list other transactions on a separate sheet of paper, if necessary.**

5.  Plaintiff has been appointed to serve as a representative party for a class in the following actions filed under the federal securities laws during the three years prior to the date of this Certification:

6.  Plaintiff is not currently seeking to serve as a representative party for a class in any actions filed under the federal securities laws.

7.  Plaintiff initially sought to serve as a representative party for a class in the following actions filed under the federal securities laws during the three years prior to the date of this Certification:

8.  The undersigned is authorized to sign this Certification on behalf of Plaintiff.

9.  Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff=s pro rata share of any recovery, or as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___th day of June, 2010.

_____
Signature

Shirley Combs
Print Name

**CERTIFICATION OF NAMED PLAINTIFF**
**PURSUANT TO FEDERAL SECURITIES LAWS**

## Shirley  Combs          9510

| no. of shares | stock symbol | buy/sold | date | price per share |
|---|---|---|---|---|
| 30 | lvs | buy | 10/9/2007 | 130.50 |
| 40 | lvs | buy | 10/9/2007 | 132.75 |
| 50 | lvs | buy | 10/9/2007 | 134.94 |
| 50 | lvs | buy | 10/10/2007 | 124.44 |
| 70 | lvs | sold | 10/11/2007 | 131.80 |
| 100 | lvs | sold | 10/16/2007 | 140.00 |
| 50 | lvs | buy | 11/2/2007 | 137.98 |
| 50 | lvs | buy | 11/5/2007 | 130.50 |
| 29 | lvs | buy | 11/6/2007 | 128.44 |
| 40 | lvs | buy | 12/6/2007 | 110.95 |
| 70 | lvs | sold | 3/26/2008 | 75.60 |
| 50 | lvs | buy | 4/2/2008 | 73.78 |
| 40 | lvs | buy | 10/29/2008 | 6.98 |
| 40 | lvs | buy | 10/29/2008 | 6.98 |

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

____WENDELL COMBS__ ("PLAINTIFF"), declares the following as to the claims asserted under the federal securities laws:

1.    Plaintiff has reviewed the complaint filed in this matter and has authorized the filing of a complaint based on similar allegations in a related or amended complaint.  Plaintiff retains Bernstein Liebhard LLP and such counsel they deem appropriate to associate with to pursue such action.

2.    Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff=s counsel or in order to participate in this private action.

3.    Plaintiff is willing to serve as a lead plaintiff either individually or as part of a group.  A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial.  I understand that the litigation is not settled, this is not a claim form, and sharing in any recovery is not dependent upon execution of this Certification.

4.    Plaintiff's transaction(s) in the **LAS VEGAS SANDS CORP.** security that is the subject of this action during the class period are as follows:

| No. of Shares | Stock Symbol | Buy/Sell | Date | Price Per Share |
|---|---|---|---|---|
| 50 | lvs | buy | 8/02/2017 | 83.62 |
| 75 | lvs | sell | 8/02/2017 | 85.01 |
| 50 | lvs | buy | 8/03/2017 | 87.09 |

Please list other transactions on a separate sheet of paper, if necessary.

5.    Plaintiff has been appointed to serve as a representative party for a class in the following actions filed under the federal securities laws during the three years prior to the date of this Certification:

6.    Plaintiff is not currently seeking to serve as a representative party for a class in any actions filed under the federal securities laws.

7.    Plaintiff initially sought to serve as a representative party for a class in the following actions filed under the federal securities laws during the three years prior to the date of this Certification:

8.    The undersigned is authorized to sign this Certification on behalf of Plaintiff.

9.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff=s pro rata share of any recovery, or as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _18_th day of June, 2010.

_Wendell Combs_
Signature

Wendell Combs
Print Name

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

### Wendell Combs          374

| no. of shares | stock symbol | buy/sold | date | price per share |
|---|---|---|---|---|
| 130 | lvs | sold | 8/7/2007 | 89.70 |
| 50 | lvs | buy | 10/17/2007 | 137.00 |
| 30 | lvs | buy | 10/18/2007 | 135.28 |
| 30 | lvs | buy | 10/22/2007 | 130.60 |
| 40 | lvs | buy | 10/23/2007 | 130.78 |
| 40 | lvs | buy | 10/24/2007 | 126.43 |
| 75 | lvs | sold | 11/1/2007 | 141.14 |
| 75 | lvs | sold | 11/1/2007 | 141.14 |
| 40 | lvs | sold | 11/1/2007 | 141.68 |
| 50 | lvs | buy | 11/5/2007 | 133.19 |
| 70 | lvs | buy | 11/6/2007 | 128.61 |
| 50 | lvs | buy | 11/7/2007 | 109.40 |
| 50 | lvs | buy | 11/9/2007 | 113.00 |